IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-CR-392 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES VACCARO, | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' RESPONSE TO R. 198

On December 15, 2022, defendant Charles Vaccaro, through counsel, filed R. 198;

namely, "Defendant Charles Vaccaro's Motion for Release of Assets Seized Pretrial."

Particularly, by the motion, defendant Vaccaro seeks the release of the following named

properties:

> 2016 Range Rover, VIN: SALWV2EF8GA544909, seized on or after July 30, 2020, pursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg.  Charles Vaccaro purchased the vehicle on or about July, 2017, from Momentum Jaguar and Volvo for $90,327.79.  Upon its purchase, the vehicle was titled to Charles Vaccaro.  There are no liens attached to the vehicle.

> 2018 Rolls Royce Dawn, VIN: SCA666D53JU115744, seized on or after July 21, 2020, pursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg.  Charles Vaccaro purchased the vehicle on or about July, 2018, from Gold Coast Exotic Imports LLC for $376,660.94.  Upon its purchase, the vehicle was titled to Charles Vaccaro.  There are no liens attached to the vehicle.

> 2018 Tesla Model S 100D, VIN: 5YJSA1E23JF261390, seized on or after July 30, 2020, pursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg.  Charles Vaccaro purchased the vehicle on or about July, 2018, from Tesla

Motor Corp. for $116,919.83.  Upon its purchase, the vehicle was titled to Charles Vaccaro.  There are no liens attached to the vehicle.

2019 Porsche 911, VIN: WP0BB2A95KS125806, seized on or after August 17, 2020, pursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg.  Charles Vaccaro purchased the vehicle on or about March, 2019, from Copans Motors Inc. for $164,481.14.  Upon its purchase, the vehicle was titled to C Weed Yacht Charter LLC, a company controlled by Charles Vaccaro.  There are no liens attached to the vehicle.

To establish that he is entitled to a pretrial, post-seizure hearing on the probable cause basis for the seizure warrants issued in this case as to the subject vehicles, defendant Vaccaro must satisfy the two-prong test established in *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998).  *See*, *United States v. Vaccaro*, No. 1:20-CR-392, 2021 WL 5316391 (N.D. Ohio Nov. 12, 2021) (Judge Solomon Oliver, Jr.) (applying *Jones* test to determine that defendant was not entitled to hearing on probable cause basis for seizure warrant of yacht).  As set forth below, because defendant Vaccaro cannot satisfy either prong of the *Jones* test, it is respectfully submitted that he is not entitled to a pretrial probable cause hearing and, accordingly, his motion for release of assets should be denied.

### FACTUAL BACKGROUND - THE SUPERSEDING INDICTMENT

On April 29, 2021, a 19-count Superseding Indictment (R. 78) was returned in N.D. Ohio Case No. 1:20-CR-392 (Judge Solomon Oliver, Jr.) against Charles Vaccaro and co-defendants Dror Svorai, Dennis Ruggeri, Kevin Hagen, Gary Berlly, and Yosef Biton.  Defendant Vaccaro was charged as follows:

Count 1:   Conspiracy to Commit Securities Fraud [15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Securities Fraud) and 15 U.S.C. §§ 78i(a)(1) and 78ff (Manipulative Securities Trading)], in violation of 18 U.S.C. § 371.

Counts 2-8:   Securities Fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. Section 240.10b-5.

Count 10:      Securities Fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. Section 240.10b-5.

Count 15:      Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349.

Counts 16-18:
      Wire Fraud, in violation of 18 U.S.C. § 1343.

Count 19:      Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. Section 1956(h).

With respect to defendant Vaccaro, a forfeiture provision set forth in the Superseding

Indictment (R. 78) specified, in relevant part, as follows:

The Grand Jury further charges:

The allegations of Counts 1 through 18, inclusive, are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  As a result of the foregoing offenses, [Defendant] CHARLES VACCARO . . . shall forfeit to the United States all property, real and personal, which constitutes - or is derived from - proceeds traceable to the commission of such offenses; including, but not limited to, the following:

- 2016 Range Rover, VIN: SALWV2EF8GA544909.  CHARLES VACCARO purchased this vehicle on or about July 2017, from Momentum Jaguar and Volvo for $90,327.79.

- 2018 Rolls Royce Dawn, VIN: SCA666D53JU115744.  CHARLES VACCARO purchased this vehicle on or about July 2018, from Gold Coast Exotic Imports LLC for $376,660.94.

- 2019 Porsche 911, VIN: WP0BB2A95KS125806.  CHARLES VACCARO purchased this vehicle on or about March 2019, from Copans Motors Inc. for $164,481.14.

- 2018 Tesla Model S 100D, VIN: 5YJSA1E23JF261390.  CHARLES VACCARO purchased this vehicle on or about July 2018, from Tesla Motor Corp. for $116,919.83.

A.    **Summary of Allegations/Charges Contained in the Superseding Indictment (R. 78) in N.D. Ohio Case No. 1:20-CR-392:**

As part of the General Allegations ("Defendants") section of the Superseding Indictment,

paragraph 1 (page 1) of the Superseding Indictment alleged:

> Defendant CHARLES VACCARO ("VACCARO") was a resident of Florida. VACCARO was a registered broker with The Financial Industry Regulatory Authority ("FINRA") until in or around 2015 when FINRA suspended VACCARO.

As part of the General Allegations ("Relevant Entities and Bank Accounts") section of

the Superseding Indictment, paragraph 7 (page 2) alleged:

> Sign N Drive Auto Mall, Inc. ("Sign N Drive") was incorporated on or about March 27, 2014, as a New York corporation with its principal place of business in Sunny Isles Beach, Florida.  VACCARO was listed as the president.  On or about September 10, 2015, JP Morgan Chase Bank account number x5389 was opened in the name of Sign N Drive.  VACCARO was the sole authorized signer on the account. [1]

As part of the General Allegations ("Relevant Entities and Bank Accounts") section of

the Superseding Indictment, paragraph 9 (page 2) alleged:

> C Weed Yacht Charter, LLC ("C Weed Yacht Charter") was registered on or about September 15, 2017, as a Florida limited liability company with its principal place of business in Sunny Isles Beach, Florida.  ...  VACCARO maintained *de facto* control of the business, its accounts, and its transactions.

As part of the General Allegations ("Relevant Publicly Traded Companies") section of

the Superseding Indictment, paragraph 25 (page 7) alleged:

> Stock for PotNetwork [Holdings, Inc. ("PotNetwork" or "POTN")], Vapor [Group, Inc. ("Vapor" or "VPOR")], CLCI [Technology, Inc. ("CLCI")], White Label Liquid[, Inc. ("White Label Liquid" or "WLAB")], Canna [Corporation ("Canna" or "CNCC")], and Grand Capital [Ventures, Inc. ("Grand Capital" or "GRCV")] ("**the**

---

[1]    As set forth below, it is respectfully submitted that there is probable cause to believe that nearly all of the $26,193,444.29 deposited into JP Morgan Chase Bank account number x5389 between April 7, 2017, and September 30, 2019, was derived from the fraudulent scheme set forth in the Superseding Indictment.  Additionally, there is probable cause to believe that all, or nearly all, of the funds used to purchase the (4) subject vehicles were derived, directly or indirectly, from JP Morgan Chase Bank account number x5389.

4

**Manipulated Public Companies**") were quoted on OTC Markets, Inc. ("OTC Markets"), an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers. Companies trading on OTC Markets tended to be very small, and the stock tended to be closely held (i.e., owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

As part of the General Allegations ("The Roles in the Manipulated Public Companies") section of the Superseding Indictment, paragraph 26 (page 7) alleged:

VACCARO controlled a substantial number of outstanding, restricted, and free-trading shares of POTN, CLCI, WLAB and CNCC through his personal companies, co-conspirators, and associates over which he had influence and control. VACCARO used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes.

As part of the General Allegations ("Registered Brokers" sub-section) of the Superseding Indictment, paragraph 43 (pages 11-12) alleged:

VACCARO, SVORAI, RUGGERI, BERLLY, BITON and others known and unknown to the Grand Jury used registered stock brokerage firms to deposit and sell shares of the Manipulated Public Companies into the open market. The Defendants typically applied to deposit shares in the names of other shares they controlled, and if accepted, deposited the shares for sale. If the application was rejected, the Defendants and others acting in concert with them applied to other brokerage firms. …

As part of the General Allegations ("Unregistered Stock-Brokers" sub-section) of the Superseding Indictment, paragraph 44 (page 12) alleged:

VACCARO, SVORAI, RUGGERI, and others acting on their behalf also used unregistered brokers to liquidate and sell free trading shares of stock in the Manipulated Public Companies after they were unable to continue to clear shares with U.S.-based registered brokers. The Defendants paid the unregistered brokers commissions, in the form of kickbacks, for selling the shares of the Manipulated Public Companies into the stock market. …

As part of the General Allegations ("Promoters" sub-section) of the Superseding Indictment, paragraph 45 (page 12) alleged:

VACCARO, SVORAI, RUGGERI, HAGEN and others used promoters and media companies to solicit potential investors to purchase their shares in the Manipulated Public Companies. The Defendants dictated what stocks the promoters "pushed." The

promotions typically coincided with favorable press releases or other information that the Defendants caused to be released. …

As part of the General Allegations ("Attorneys" sub-section) of the Superseding

Indictment, paragraph 46 (pages 12-13) alleged:

The Defendants and others provided attorneys with fraudulent information to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, *et al*., often referred to as Rule 144. These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations. The Defendants and others provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions.

As part of the General Allegations ("The SEC and Securities Regulations") section of the

Superseding Indictment, paragraphs 47-51 (pages 13-14) alleged:

The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the United States-based stock exchanges. Stock for the Manipulated Public Companies was registered with the SEC.

Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in the companies subject to SEC regulations; and (c) the public. Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

Failure to disclose to investors the commission payments from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction under federal securities law.

"Kickbacks" were paid to co-conspirators in a variety of ways, including but not limited to, undisclosed commissions for selling shares, retainage of illicit proceeds, and heavily discounted blocks of shares so the co-conspirator could also profit from the manipulated stock.

The term "issuer" in the Securities Act included any person directly or indirectly controlling or controlled by, or any person under direct or indirect common control with, the issuer.

As part of the General Allegations ("Relevant Regulatory Principles and Definitions")

section of the Superseding Indictment, paragraphs 52-55 (pages 14-15) alleged:

"Microcap" or "penny" stocks were stocks of publicly traded U.S. companies with a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

Convertible debt was a form of short-term debt that could be converted into equity. Small publicly traded companies typically needed money for expenses or capital they normally could not afford. Issuing convertible debt in the form of notes gave the company instant cash flow for expenses and the lender or future shareholder received the right to convert the note into equity in the company. There were restrictions and guidelines set forth by regulating bodies such as the SEC, however, that required certain disclosures associated with these transactions.

Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 made it illegal for anyone to, among other things, employ any scheme to defraud, make an untrue statement or omission of material fact, or engage in any act, practice, or course of business, in connection with the purchase or sale of any security - regardless of whether the registered public company was registered under Section 12 of the Securities Act or required to file reports under Section 15(d) of the Securities Act or "unregistered."

Market manipulation schemes known as "pump and dump" schemes typically involved creating a price for a security that was not reflective of true market value, thereby allowing the Defendants holding large blocks of the inflated stock to sell shares they obtained for little or no money at the inflated price. The purchasing party was left with a near-worthless security when the price dropped to accurately reflect the stock's true value, or lack thereof, in the market. There were generally three phases to a pump and dump scheme: (i) obtaining and concealing control of a significant portion of a publicly traded company's stock, (ii) fraudulently inflating or keeping inflated the price and trading volume of the company's stock through a variety of means, including controlling the release of favorable news, directing and coordinating with promoters and co-conspirators by providing press releases and other materials in advance of its release to the public, and obfuscating the parties paying for the promotion; and (iii) after the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby profiting at the expense of the investing public.

As part of The Schemes to Defraud section of the Superseding Indictment, paragraphs

56-57 (pages 15-16) alleged:

7

From in and around January 2014, through on or about July 19, 2019, VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, BITON and others, known and unknown to the Grand Jury, knowingly and intentionally conspired to commit an offense against the United States, that is, Securities fraud, by conspiring and agreeing to defraud investors and potential investors in the Manipulated Public Companies by issuing millions of stock/shares to themselves at little or no cost and then artificially controlling the price and volume of shares by, among other means: (a) using convertible notes to issue debt to themselves or nominees who then converted the debt into freely tradeable shares of the Manipulated Public Companies, thereby fraudulently concealing the Defendants ownership or control interests in the Manipulated Public Companies; and (b) fraudulently engineering price movements and trading volume in the stocks.

VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, BITON and others, known and unknown to the Grand Jury, also conspired to devise a scheme to fraudulently conceal the proceeds of offshore stock sales in the Manipulated Public Companies by creating and transmitting through interstate wire communications falsified documents purporting to pay a consultant, who, in fact, as they then well knew, was to launder the proceeds of the offshore stock sales back into the United States for the benefit of VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, BITON and others.

As part of The Schemes to Defraud ("The Pump: Inflation of the Fraudulent Stock of the Manipulated Public Companies") section of the Superseding Indictment, paragraphs 58-62 (pages 16-17) alleged:

After gaining control of the Manipulated Public Companies stocks, VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, and BITON together with others, devised and intended to devise a scheme whereby they fraudulently inflated the Manipulated Public Companies share prices and trading volumes and then orchestrated the sale and purchase of the Manipulated Public Companies stock at a profit.

VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, BITON and others, sought to manipulate the Manipulated Public Companies stock through promotional media efforts designed to generate public interest and trading volumes in the stock. Having control of significant amounts of the stock, VACCARO, SVORAI, RUGGERI and others controlled the volume of trading by coordinating the sale of large blocks of shares timed with press releases paid by the company or entities controlled by the Defendants.

VACCARO, SVORAI, and others, had influence and control of the authorship, timing, and content of press releases issued by the Manipulated Public Companies.

VACCARO, SVORAI, and [another] directed payments for promotion of POTN, WLAB, CLCI, VPOR and GRCV to be paid directly and indirectly from nominee corporation bank accounts to conceal the identity of the individuals touting the stock.

During the periods when the Manipulated Public Companies' stock was being promoted and manipulated, the value of the stocks had little or no relation to their actual current and future earnings potential or business operations.

As part of The Schemes to Defraud ("The Dump: Profits at Investors' Expense") section of the Superseding Indictment, paragraph 63 (page 17) alleged:

> VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, BITON and others known and unknown to the Grand Jury, obtained millions of shares in the Manipulated Public Companies at little or no cost and then profited by selling their own shares in PotNetwork, Vapor, CLCI, White Label Liquid, Canna, and Grand Capital stock to investors at fraudulent and artificially inflated prices without disclosing that they controlled the shares being sold into the market and their relationship with and control of the Manipulated Public Companies.  Little, if any, portion of the investments went to fund the operations of the Manipulated Public Companies.  Rather, VACCARO, SVORAI, RUGGERI, HAGEN, BERLLY, BITON and others used most of the investments to enrich themselves.

As set forth above, defendant VACCARO - along with co-defendants Dror Svorai, Dennis Ruggeri, Kevin Hagen, Gary Berlly, and Yosef Biton - was charged in Count 1 of the Superseding Indictment (R. 78) with Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371.  Particularly, in this regard, the Grand Jury charged as follows at paragraphs 65-67 (pages 17-22) of the Superseding Indictment:

*Statutory Violations*

> From in or around January 2014, through on or about July 19, 2019, within the Northern District of Ohio, Eastern Division, and elsewhere, defendants CHARLES VACCARO, DROR SVORAI, DENNIS RUGGERI, KEVIN HAGEN, GARY BERLLY, and YOSEF BITON, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, to wit:
>
> a.     To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members

9

of the investing public and sellers and purchasers of PotNetwork Holdings, Inc., Vapor Group, Inc., CLIC Technology, Inc., White Label Liquid, Inc., Canna Corporation, and Grand Capital Ventures, Inc.'s securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud); and

      b.      To knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entering an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties, and (b) entering any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same and different, parties, in violation of Title 15, United States Code, Sections 78i(a)(1) and 78ff (Manipulative Securities Trading).

*Objects of the Conspiracy*

      The objects of the conspiracy included, but were not limited to: (1) defrauding the investors; (2) obtaining investor monies and pay and receive undisclosed commissions; (3) inflating the value of the Manipulated Public Companies; and (4) enriching the conspirators.

*Manner and Means*

It was part of the conspiracy that:

      a.      VACCARO, SVORAI, BITON, and others, obtained control of public "shell" companies and executed sales and mergers of businesses with the shells to create publicly traded companies.

      b.      VACCARO, SVORAI, and others, controlled existing debt of the publicly traded companies and indebted those companies using convertible notes they ultimately controlled, and then converted the notes into free-trading, unrestricted shares.

      c.      VACCARO, SVORAI, and others, sold those shares into the market while concealing that they, in fact, controlled the shares and the stock of the Manipulated Public Companies.

      d.      VACCARO, SVORAI, RUGGERI, and others, used manipulative stock trading techniques, such as transferring convertible notes and large blocks of shares to

nominees and other entities they controlled, to conceal their control of the stock in the Manipulated Public Companies.

e.      VACCARO, SVORAI, and others, were authorized signers on the bank accounts for nominees and other entities they controlled in order to transfer proceeds of the sale of shares of the Manipulated Public Companies and pay expenses, such as payments to promoters.

f.      VACCARO, SVORAI, RUGGERI, and others, tracked the ownership percentage of their nominees and entities they controlled to ensure that each nominee stayed below certain reporting thresholds to further conceal the true control of the Manipulated Public Companies.

g.      VACCARO, SVORAI, and others, sold, at a discount, large blocks of shares in the Manipulated Public Companies to co-conspirators who were aware of the stock manipulation scheme in order for the co-conspirators to profit when the stocks were promoted and for the Defendants to receive payment for the shares upfront.

h.      VACCARO, SVORAI, and others, controlled and directed the issuance of board resolutions authorizing the conversion of notes into free-trading shares of the Manipulated Public Companies.

i.      VACCARO, SVORAI, RUGGERI, and others, sought out and provided false, incomplete, and fraudulent information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing the stock for sale.

j.      VACCARO, SVORAI, BERLLY, and others, deposited and attempted to deposit shares of the Manipulated Public Companies at registered brokers, and if the deposit was rejected, Defendants sought out another broker who would accept the deposit.

k.      VACCARO, SVORAI, HAGEN, and others, paid stock promoters and media companies to promote the Manipulated Public Companies at the same time the Defendants and others were depositing large blocks of shares with registered and unregistered brokers.

l.      VACCARO, SVORAI, RUGGERI, and others, provided press releases from the Manipulated Public Companies to each other and to co-conspirators in advance of the press release's release date.

m.      VACCARO, SVORAI, RUGGERI, and others, caused the creation and release of favorable press releases and other information to promote the Manipulated Public Companies.

n.      VACCARO, SVORAI, and others, paid undisclosed commissions and kickbacks to co-conspirators who helped facilitate the sale shares of the Manipulated Public Companies.

o.      VACCARO, SVORAI, and others, provided false, incomplete, and fraudulent information to attorneys to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements to deposit stock.

p.      VACCARO, SVORAI, and others, paid undisclosed commissions and kickbacks to co-conspirators for the repatriation of proceeds of sales of shares of the Manipulated Public Companies sold outside the United States.

q.      VACCARO, SVORAI, and others, divided up the proceeds from the sale of shares of the Manipulated Public Companies in accordance with their respective interests in shares sold.

r.      SVORAI and VACCARO made threats to kidnap and kill co-conspirators who did not pay them money they believed they were owed.

## THE *JONES* TEST

Whether - and under what circumstances - a defendant may challenge a pretrial seizure warrant is a question that has been fully developed by the courts.  Under the *Jones* test, a defendant is entitled to a pretrial, post-seizure hearing on the probable cause basis for the seizure warrant only if he makes two threshold showings: (1) that he has no assets other than those subject to the seizure warrant with which to exercise his 6th Amendment right to counsel or to pay for living expenses; and, (2) that there is a *bona fide* reason to believe that the magistrate judge/grand jury erred in finding probable cause to believe that the seized property would be subject to forfeiture if the defendant is convicted.  *United States v. Jones*, 160 F.3d 641, 647-648 (10th Cir. 1998) (defendant has initial burden of showing that he has no funds other than the restrained assets to hire private counsel or pay for living expenses, and that there is *bona fide* reason to believe the restraining order should not have been entered).  *See*, *United States v. Vaccaro*, No. 1:20-CR-392, 2021 WL 5316391 (N.D. Ohio Nov. 12, 2021) (district courts in this Circuit consistently analyze pretrial, post-seizure challenges to a seizure order under the two-

prong test established in *Jones*); and, *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) (applying the *Jones* test to determine whether the defendant was entitled to a probable cause hearing on the court's order freezing his assets).  If the defendant makes both showings, he is entitled to a probable cause hearing; if he does not, the property remains subject to restraint pending the conclusion of the criminal trial.

Under the first *Jones* requirement, the defendant has the burden of showing that he lacks other funds with which to retain counsel; a bare-bones allegation that he has limited cash on hand and no income is not sufficient.  The defendant must disclose his assets, liabilities, and sources of income and say how much he has already paid counsel and how much more he needs.  And, he must also show that he does not have access to funds from third parties, such as friends or family members.  *See*, for example, the following cases:

- *United States v. Bonventre*, 720 F.3d 126, 133 (2nd Cir. 2013) (to qualify for a post-restraint hearing, the defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his significant living expenses; it is not enough to contrast his income stream and bank account balances with his living expenses and legal fees).

- *United States v. Emor*, 794 F. Supp. 2d 143, 150 (D.D.C. 2011) (a bare-bones statement that defendant has only $50,000.00 in cash on hand, multiple dependents, and no income is insufficient; nor can defendant wait until the probable cause hearing is commenced to satisfy the requirement; it is a *threshold* showing that must be made *before* the hearing).

- *United States v. Edwards*, 856 F. Supp. 2d 42, 45-46 (D.D.C. 2012) (following *Emor*; defendant must disclose his assets, liabilities, and sources of income; say how much he has already paid counsel and how much more he needs; and demonstrate that the property belongs to him so that it will be available to pay counsel if released).

- *United States v. Hernandez-Gonzalez*, No. 16-CR-669, 2017 WL 2954676 (S.D. Fla. June 26, 2017) (following *Bonventre;* defendant must "identify his assets, liabilities, sources of income, net worth, whether he has access to financial accounts, and the expected costs of his defense team").

- *United States v. Amoruso*, No. 3:08-CR-80, 2009 WL 1037917, at *1 (N.D. W.Va. Mar. 30, 2009) (defendant cannot object to the entry of a pre-trial restraining order without first demonstrating that the property is needed to pay attorney's fees).

13

- *United States v. Varner*, No. 5:05-CR-25, 2005 WL 2206083, at *1 (W.D. Va. Sept. 9, 2005) (denying defendant's request for a probable cause hearing for failure to show that he was "completely unable to afford counsel without resorting to the restrained assets").

- *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) (following *Jones*; to satisfy the Sixth Amendment requirement, defendant must show he has no access to funds from friends or family), *aff'd*, 427 F.3d 394 (6th Cir. 2005); *Vaccaro*, 2021 WL 5316391, at *3 (same).

- *United States v. Marshall,* No. 5:15-CR-36, 2015 WL 4139368, at *5 (N.D. W.Va. July 9, 2015) (to qualify for a probable cause hearing under *Jones*, the defendant must disclose all of his assets and demonstrate that he lacks other funds - including funds from friends and family – with which to retain counsel).

Under the second *Jones* requirement, the defendant must show there is a *bona fide* reason

to believe that the magistrate judge/grand jury erred in finding probable cause to believe the

property was subject to forfeiture. Merely alleging that the seized property is untainted is not

enough. *See*, for example, the following cases:

- *United States v. Peppel*, No. 3:06-CR-196, 2008 WL 687125, at *2, *6 (S.D. Ohio Mar. 10, 2008) (applying *Jamieson*, 189 F. Supp. 2d at 757 (N.D. Ohio 2002); defendant satisfies the first prong of *Jones* by showing that even if he has some unrestrained assets, they are not sufficient to fund his defense in a complex securities fraud case, but he is not entitled to probable cause hearing because he cannot satisfy the second prong; there was no reason to believe the grand jury erred in finding that the restrained property was traceable to criminal proceeds).

- *United States v. Vaccaro*, No. 1:20-CR-392, 2021 WL 5316391, at *3 (N.D. Ohio Nov. 12, 2021) (denying post-seizure probable cause hearing because defendant failed to set forth a "*bona fide* reason to believe that the court – or the grand jury on the Superseding Indictment - erred in finding probable cause to believe that the yacht is subject to forfeiture").

- *United States v. Wijetunge,* No. 15-CR-144, 2015 WL 6605570, at *9 (E.D. La. Oct. 28, 2015) (if, upon review of the application for the § 853(f) seizure warrant, the court finds probable cause to believe the property is subject to forfeiture, it necessarily finds that the defendant has not satisfied the second *Jones* requirement).

- *United States v. Vogel*, No. 4:08-CR-224, 2010 WL 547344, at *3 (E.D. Tex. Feb. 10, 2010) (defendant cannot rely on self-serving statement regarding the legitimate source of the property to satisfy the second *Jones* requirement).

- *United States v. St. George*, 241 F. Supp. 2d 875, 878-80 (E.D. Tenn. 2003) (following *Jones*; defendant must make threshold showing that she lacks alternative source of funds

14

to retain counsel *and* that there is reason to believe there is no probable cause for the forfeiture of the restrained property; denying hearing to defendant who failed to make second showing).

• *But see, United States v. Byrd,* 153 F. Supp. 3d 851 (D. Md. 2015) (defendant's assertion, without supporting documentation, that his seized currency came from a legitimate source is sufficient to satisfy the second *Jones* requirement and trigger the right to a probable cause hearing).

## DEFENDANT VACCARO HAS FAILED TO MEET
## THE FIRST PRONG OF THE *JONES* TEST

In addition to the four subject vehicles, the Superseding Indictment (R. 78) returned in this case also named for forfeiture defendant Vaccaro's 2001 Azimut Sea Jet (the "yacht").  The yacht was seized on or about August 5, 2021, pursuant to the execution of a federal seizure warrant.  Shortly after the yacht was seized, defendant Vaccaro filed a Motion to Stay (R. 128), asking the Court to stay the execution of the seizure warrant and to hold a hearing to determine if the United States had probable cause to seize the yacht.

In denying defendant Vaccaro's Motion to Stay, this Court applied the two-prong test established in *United States v. Jones*, 160 F.3d 641, 643 (10th Cir. 1998).  As set forth above, the first prong of the *Jones* test required defendant Vaccaro to show that he had no other assets to exercise his 6th Amendment right to counsel or to pay for living expenses.  The Court issued its Order (R. 156) on November 12, 2021.  In finding that defendant Vaccaro failed to meet his burden with respect to the first prong of the *Jones* test, this Court stated, *inter alia*, as follows: "In fact, the Government has produced evidence to the contrary – namely, the Government informed the court during the hearing on the Motion to Stay that Vaccaro has another luxury yacht, which currently is not subject to forfeiture."  R. 156: Order, at PageID 860. [2]

---

[2]        As indicated above, the Court's Order (R. 156) was published as Westlaw citation 2021 WL 5316391.

In the instant Motion for Release of Assets Seized Pretrial (R. 198), defendant Vaccaro refers to this 2nd luxury yacht as the "other boat". With respect to the first prong of the *Jones* test, defendant Vaccaro's position in the motion is that he has no other assets - other than the seized vehicles – because he has "lost his interest in the other boat". Particularly, while acknowledging that the other boat has not been sold, defendant Vaccaro states as follows at PageID 992-93 of the motion:

> Mr. Vaccaro lost his interest in the other boat he had partnered with Ms. Feldman as an investment. The other boat required approximately $85,000 in repairs/improvements to be in saleable condition. Mr. Vaccaro could not contribute his share of those costs. Ms. Feldman agreed to pay the entirety of the costs in exchange for Mr. Vaccaro's interest.

Attached hereto as Exhibit 1 is the Affidavit of Special Agent Anthony Fry, Federal Bureau of Investigation. SA Fry has been involved in the financial fraud investigation of Charles Vaccaro since approximately May 2019. Based upon SA Fry's investigation - and the financial information set forth in his Affidavit - defendant Vaccaro has a present equity interest in the "other boat" to the extent of approximately $422,908.00. Accordingly, it strains credulity to believe that defendant Vaccaro would surrender such interest - in its entirety - as a result of any payment by Ms. Feldman of approximately $85,000.00 in repairs/improvements. Particularly, in pertinent part, FBI SA Fry sets forth the following in the Affidavit:

> 1.      On or about August 23, 2019, C-Weed International Yacht Charters LLC was incorporated as a Florida Limited Liability Company, with its principal place of business as 18555 Collins Avenue, Apt. 4301, Sunny Isles, Florida 33160 - which was then VACCARO's address. Sheril Feldman, VACCARO's girlfriend, was listed as the registered agent of the company. VACCARO and Feldman were both identified as the authorized persons to manage and control the company. (Affidavit of FBI SA Anthony Fry, at ℙ 4).

> 2.      On or about August 29, 2019, VACCARO and Feldman opened a bank account at JP Morgan Chase Bank in the name of C-Weed International Yacht Charters LLC ending in x9032. VACCARO and Feldman were the signatories listed on the account, which also used the 18555 Collins Avenue address. VACCARO's telephone number, 516.474.xxxx, was listed on the account. (*Id*., at ℙ 5).

16

3.      Between August 29, 2019, and September 9, 2019, approximately $300,000.00 was deposited into the C-Weed International Yacht Charters LLC account ending in x9032.  The approximately $300,000.00 deposited consisted of the following:

a.)      On August 29, 2019, VACCARO executed an internal bank transfer from Sunny Isles Capital LLC JP Morgan Chase Bank account x1370 to C-Weed International Yacht Charters LLC JP Morgan Chase Bank account x9032 in the amount of $150,000.00.

b.)      On September 4, 2019, Feldman executed an internal bank transfer from a Sheril Feldman JP Morgan Chase account ending in x8765 to C-Weed International Yacht Charters LLC JP Morgan Chase Bank account x9032 in the amount of $150,000.00.  (*Id.*, at ¶ 6).

4.      On September 9, 2019, withdrawals of $97,500.00 from the C-Weed International Yacht Charters LLC JP Morgan Chase Account x9032 were made in two separate cashier's checks to purchase the ["other boat"], a 1984 Magnum Marine 53', Hull ID Number: MAG530270682, Vessel Official Number: D671092.  The ["other boat"] was titled to C-Weed International Yacht Charters LLC and named C-Weed II. The two separate cashier's checks were as follows:

a.)      On September 9, 2019, cashier's check # 9822826285 in the amount of $87,500.00 made payable to Guy Lamotta for the purchase of the ["other boat"].

b.)      On September 9, 2019, cashier's check # 9822826286 in the amount of $10,000.00 made payable to Lamotta Enterprise LTD for the purchase of the ["other boat"].  (*Id.*, at ¶ 7).

5.      FBI Agents interviewed Patrick Fay, the nephew of Guy Lamotta, on October 27, 2021.  Fay was the operator of Manhasset Bay Marina, the business previously owned by Guy Lamotta.  Fay has operated the business since Lamotta's death. Fay confirmed that VACCARO directly purchased the ["other boat"] from Lamotta and had the watercraft transported to Florida.  VACCARO informed Fay that the ["other boat"] was purchased by VACCARO with the intent to refurbish the watercraft and use it as a charter boat on the intercoastal waterway.  (*Id.*, at ¶ 8).

6.      After the purchase of the ["other boat"], the balance of C-Weed International Yacht Charters LLC account x9032 on September 10, 2019, was $202,500.00.  From September 10, 2019 to September 2020, approximately another $732,705.00 was deposited into the bank account, of which $705,000.00 - or 96.2% - was from VACCARO.  Below is a summary of the inflows into the account:

a.)      From February 2020 to July 2020, VACCARO wired $690,000.00 from C-Weed Yacht Charter LLC Suntrust bank account ending in x0005 that was controlled by VACCARO.

b.)  In May 2020, Sheril Feldman wired $25,000.00 into the bank account from a personal account.

c.)  In April 2020, VACCARO wired $15,000.00 from Sunny Isles Capital LLC Suntrust bank account ending in x6999 that was controlled by VACCARO.

d.)  From August 2020 to September 2020, the bank account received $2,705.00 from other sources.  (*Id*., at ₱ 9).

7.  From September 2019 to September 2020 - through a combination of wires, checks, and debit card transactions - C-Weed International Yacht Charters LLC account x9032 paid approximately $412,027.76 to boat and marine related businesses for the improvement and operation of the ["other boat"].  (*Id*., at ₱ 10).

Based upon FBI SA Fry's Affidavit, it cannot be disputed that defendant Vaccaro has a substantial, present equity interest in the "other boat".  As set forth above, during the relevant time period - August 29, 2019, through September 2020 - approximately $1,032,705.00 was deposited into the bank account ending in x9032 at JP Morgan Chase Bank in the name of C-Weed International Yacht Charters LLC.[3]  Of this amount, $855,000.00 - or 83% - can be attributed to defendant Vaccaro.  Between August 29, 2019 and September 2020, a total of approximately $509,527.76 was paid from the account to boat and marine related businesses for the purchase, improvement, and operation of the "other boat".  83% of $509,527.76 is $422,908.00.  Accordingly, defendant Vaccaro's present equity interest in the "other boat" is $422,908.00.[4]

---

[3]  For purposes of the first prong of the *Jones* test, it does not matter whether this approximately $1,032,705.00 was "tainted" or "untainted" funds.  That issue comes into play only with respect to the *Jones* test's second prong.  Under the first prong, the only issue is whether defendant Vaccaro has available assets - tainted or untainted - with which to exercise his 6th Amendment right to counsel.

[4]  Additionally, this $422,908.00 figure does not take into account any appreciation of the "other boat".  As set forth at paragraph 14 of FBI SA Fry's Affidavit: "As of January 5, 2023, [the "other boat"] was listed for sale through Denison Yacht Sales for $599,000.00.  The listing through Denison has been active since approximately October 19, 2022."

18

Further, that defendant Vaccaro has a present, continuing interest in the "other boat" also is demonstrated by other surrounding circumstances developed by the case agents during their investigation. First, as set forth in FBI SA Fry's Affidavit, defendant Vaccaro remains actively involved in the operation of the "other boat". Particularly, SA Fry's Affidavit states:

1.     Yachtlife [Technologies Inc ("Yachtlife")] is an online platform and mobile app that allows the public to charter or purchase luxury yachts. As of January 5, 2023, [the "other boat"] was listed on Yachtlife, available for charter for $1,900.00 for 4 hours, $2,500.00 for 8 hours, and $15,000.00 per week. (Affidavit of FBI SA Anthony Fry, at ¶ 12).

2.     [The "other boat"] also is listed on the website BoatSetter.com for charter, advertised as "Rent this 60' Sport Yacht in Fort Lauderdale!". **On the listing for [the "other boat"], the yacht is listed as owned by "Charlie 5.0 (3 ratings)".** [5] [The "other boat"] is available for charter for 4 hours at a rate of $1,450.00 excluding fees, or for 6 hours for $2,100.00 excluding fees. BoatSetter contains several ratings and reviews of the charters of [the "other boat"], which appear to identify VACCARO ("Charlie") as operating the charter:

a.)     A review from November 2022 states: "I had a great time! Charlie was very helpful and accommodating. I would definitely book again. I booked for my girlfriend's 30th birthday and she had an amazing time."

b.)     Another review from August 2022: "Could not have had a better experience. The boat, which was a head turner everywhere we went, was in great shape, and the design is perfect if you like to get lots of sun (although if you don't, you can stay out of the sun under the bimini top). The Captain (Charlie) and Mate (Fabricio) were super nice and accommodating. Definitely my go to charter in South Florida." *Id*., at para. 13).

Second, again as set forth in FBI SA Fry's Affidavit, on April 22, 2022, Sheril Feldman signed an Articles of Amendment to the Articles of Organization, changing the name of C-Weed International Yacht Charters, LLC to Marchese Yacht Charters, LLC. Also included in the amendment was the removal of VACCARO as an authorized member of the company. The

---

[5]     Defendant Vaccaro's first name is Charles. Also, in addition to showing continuing interest, these listings would indicate that Vaccaro is receiving more than minimal income from chartering the "other boat".

effective date of the amendment was March 1, 2022.  At some time prior to April 22, 2022, the name of the ["other boat"] was changed from C-Weed II to Marchese Yacht.  (Affidavit of FBI SA Anthony Fry, at ‖ 11).

As set forth above, this Court issued an Order (R. 156) on November 12, 2021, denying defendant Vaccaro's Motion to Stay (R. 128), which sought a hearing on the probable cause basis for the seizure warrant issued in this case as to the yacht named for forfeiture in the Superseding Indictment.  In finding that defendant Vaccaro failed to meet his burden with respect to the first prong of the *Jones* test, this Court noted that "the Government informed the court during the hearing on the Motion to Stay that Vaccaro has another luxury yacht [i.e., the "other boat"], which currently is not subject to forfeiture."  R. 156: Order, at PageID 860.  In light of this Order, and defendant Vaccaro's continuing efforts to seek the release of seized properties, it would appear inconsistent with transparent, above board dealing that – within months of the Order - defendant Vaccaro was removed as an authorized member of the company and the name of the "other boat" was changed from C-Weed II to Marchese Yacht.

Based upon the foregoing, it is respectfully submitted that defendant Vaccaro has failed to meet the first prong of the *Jones* test in that he has assets – other than those subject to a seizure warrant – with which to exercise his 6th Amendment right to counsel or to pay for living expenses.  As set forth above, defendant Vaccaro's present equity interest in the "other boat" is $422,908.00 and he remains actively involved in its operation.

**DEFENDANT VACCARO HAS FAILED TO MEET**
**THE SECOND PRONG OF THE *JONES* TEST**

Even if defendant Vaccaro could satisfy the first prong of the *Jones* test, his Motion for Release of Assets Seized Pretrial (R. 198) nevertheless fails because he cannot satisfy the *Jones* test's second prong.  Under the second prong, a defendant must show there is a *bona fide* reason

20

to believe that the magistrate judge (in issuing the seizure warrants) and the grand jury (on the Superseding Indictment) erred in finding probable cause to believe that the properties would be subject to forfeiture if the defendant is convicted.  Defendant Vaccaro fails the second prong of the *Jones* test because, based upon the financial information set forth below, it cannot reasonably be disputed that the (4) subject vehicles were purchased with funds traceable to the schemes/acts charged in the Superseding Indictment.

Attached hereto as Exhibit 2 is the Affidavit of Forensic Accountant (FoA) Alex Chuna, Federal Bureau of Investigation.  FoA Chuna has participated in the investigation of securities fraud by Charles Vaccaro, and others, since approximately 2019.  During the investigation, FBI FoA Chuna acquired and reviewed bank and other financial records.  Particularly, with respect to defendant Vaccaro's acquisition of the subject vehicles, FoA Chuna sets forth the following in his Affidavit:

1. On September 15, 2017, Charles Vaccaro opened a bank account at JP Morgan Chase in the name of C Weed Yacht Charter LLC ending in x8185 (**Bank Account 1**).  Charles Vaccaro was the signor on the account. [6]  **Approximately $4,150,000.00 was deposited into Bank Account 1** between September 15, 2017 and August 2019, which consisted of the following deposits:

   • From October 2017 to August 2019, **Bank Account 1 received approximately $3,900,000.00 in bank transfers from Bank Account 3**, which is described below. [7]

---

[6]      Also on September 15, 2017, Charles Vaccaro opened a related savings account at JP Morgan Chase in the name of C Weed Yacht Charter LLC ending in x2126.  Throughout the investigation, that account has been referred to as **Bank Account 2**.  Although any account activity in Bank Account 2 is immaterial to the instant Response, the investigation's numbering system is used herein for purposes of consistency.

[7]      The 16 separate transactions by which Vaccaro transferred $3,900,000.00 from Bank Account 3 to Bank Account 1 are listed at paragraph 7 of FBI FoA Chuna's Affidavit.

- In September 2018, Bank Account 1 received approximately $250,000.00 in the form of a bank transfer from Bank Account 4. [8] (Affidavit of FBI FoA Alex Chuna, at ℙ 3).

2.     On September 10, 2015, Charles Vaccaro opened a bank account at JP Morgan Chase in the name of Sign N Drive Auto Mall Inc ending in x5389 (**Bank Account 3**). Charles Vaccaro was the only signor on the account until the account was closed on September 30, 2019. **Approximately $26,193,444.29 was deposited into Bank Account 3 between April 7, 2017 and September 30, 2019.** On April 7, 2017, the balance of Bank Account 3 was $2,647.76. (*Id.*, at § 4).

3.     Paragraph 5 of FBI FoA Chuna's Affidavit states: Your Affiant respectfully submits that nearly all (at least 96%) of the $26,193,444.29 deposited into Bank Account 3 was derived from the fraudulent scheme charged in the Superseding Indictment returned in N.D. Ohio Case No. 1:20-CR-392. As set forth below, Bank Account 3 received at least this amount from unregistered brokerage firms, a registered brokerage firm, and a business associated with Charles Vaccaro used to facilitate the fraudulent scheme. Additionally, all - or nearly all - of the funds deposited into Bank Account 1 during the relevant time period were derived, directly or indirectly, from Bank Account 3. In particular, the deposits into Bank Account 3 consisted of the following:

- From April 2017 to June 2018, Bank Account 3 received approximately $16,161,231.99 from Wilson and Davis. Wilson and Davis is a registered brokerage firm.

- On August 1, 2018, Bank Account 3 received approximately $150,000.00 from

---

[8]     Bank Account 4 was a bank account at JP Morgan Chase opened on March 8, 2018 by co-defendant Gary Berlly and Charles Vaccaro, in their own names. The account ended in x9969. Between March 2018 and January 2019, approximately $321,587.58 was deposited into Bank Account 4. The deposits consisted of transfers from Bank Account 3 and L2 Capital LLC, an unregistered brokerage firm. (Affidavit of FBI FoA Chuna, at ℙ 6).

22

Back Nine Capital, LLC.  Back Nine Capital LLC is a business associated with Charles Vaccaro used to facilitate the fraudulent scheme.

- From August 2018 to March 2019, Bank Account 3 received approximately $2,800,000.00 from Woodmont Investment Group.  Woodmont Investment Group is an unregistered brokerage firm.

- From October 2018 to January 2019, Bank Account 3 received approximately $1,930,824.83 from L2 Capital LLC.  L2 Capital LLC is an unregistered brokerage firm.

- On February 21, 2019, Bank Account 3 received approximately $408,556.00 from Ramos and Ramos Investments Ltd.  Ramos and Ramos Investments Ltd is an unregistered brokerage firm.

- During March 2019, Bank Account 3 received approximately $415,850.00 from River Ridge Partners, LP.  River Ridge Partners, LP is an unregistered broker.

- From April 2019 to June 2019, Bank Account 3 received approximately $2,592,730.00 from Green Coast Capital International SA LLC.  Green Coast Capital International SA LLC is an unregistered brokerage firm.

- From April 2019 to June 2019, Bank Account 3 received approximately $782,448.00 from Mudai Nakagawa, the operator of an unregistered offshore brokerage firm.

- From November 2017 to March 2018, Bank Account 3 received approximately $828,050.47 from other Sign N Drive Auto Mall Inc accounts from other banking institutions.

- From February 2017 to May 2019, Bank Account 3 received approximately $123,753.00 from other unidentified sources.

4.      Paragraph 8 of FBI FoA Chuna's Affidavit states: Defendant Vaccaro used funds from Bank Account 1 and/or Bank Account 3 to purchase the (4) subject vehicles, as follows:

a.)     In June 2017, Charles Vaccaro purchased the subject 2016 Range Rover, VIN: SALWV2EF8GA544909, white in color, from Momentum Jaguar Volvo in two separate transactions totaling $90,327.79 **from Bank Account 3**.  Momentum Jaguar Volvo purchase records show that Charles Vaccaro purchased this 2016 Range Rover on or around June 15, 2017.  The separate transactions were as follows:

23

On June 15, 2017, Charles Vaccaro made a debit card purchase of $1,000.00 from **Bank Account 3** to Momentum Jaguar Volvo to purchase the 2016 Range Rover.

On June 19, 2017, Charles Vaccaro took out a cashier's check in the amount of $89,327.79 from **Bank Account 3** to Momentum Jaguar Volvo to purchase the 2016 Range Rover.

b.)     From March 2018 to July 2018, Charles Vaccaro wired $376,660.94, in three separate wires, to Gold Coast Exotic Imports LLC to purchase the subject 2018 Rolls Royce Dawn, blue in color, VIN: SCA666D53JU115744.  Gold Coast Exotic Imports LLC purchase records show that Charles Vaccaro purchased this 2018 Rolls Royce Dawn on or around July 16, 2018.  The separate wires were as follows:

On March 30, 2018, Charles Vaccaro wired $25,000.00 from **Bank Account 1** to Gold Coast Exotic Imports LLC to purchase the 2018 Rolls Royce Dawn.

On July 2, 2018, Charles Vaccaro wired $127,000.00 from **Bank Account 1** to Gold Coast Exotic Imports LLC to purchase the 2018 Rolls Royce Dawn.

On July 16, 2018, Charles Vaccaro wired $224,660.94 from **Bank Account 1** to Gold Coast Exotic Imports LLC to purchase the 2018 Rolls Royce Dawn.

c.)     On March 15, 2019, Charles Vaccaro wired $164,481.14 from **Bank Account 1** to Copan Motors Inc to purchase the subject 2019 Porsche 911, VIN: WP0BB2A95KS125806, white in color.  Charles Vaccaro placed an additional $2,500.00 deposit on the 2019 Porsche 911 on an unrelated credit card.  Copan Motors Inc purchase records show that Charles Vaccaro purchased this 2019 Porsche 911 on or around March 15, 2019.

d.)     From May 2018 to June 2018, Charles Vaccaro purchased the subject 2018 Tesla Model S 100D, VIN: 5YJSA1E23JF261390, from Tesla Motor Corp in two separate debit card purchases totaling $116,919.83.  Tesla Motor Corp purchase records show that Charles Vaccaro purchased this 2018 Tesla Model S 100D on or around June 23, 2018.  The separate debit card purchases were as follows:

On May 8, 2018, Charles Vaccaro made a debit card purchase of $2,500.00 from **Bank Account 3** to Tesla Motor Corp to purchase the 2018 Tesla Model S 100D.

On June 26, 2018, Charles Vaccaro made a debit card purchase of $114,419.83 from **Bank Account 3** to Tesla Motor Corp to purchase the 2018 Tesla Model S 100D.

Based upon the foregoing, it cannot reasonably be disputed that probable cause exists that the (4) subject vehicles were purchased with tainted funds and, accordingly, were properly seized pursuant to federal seizure warrants issued by U.S. Magistrate Judge Jonathan D. Greenberg and were properly included in the Superseding Indictment.  As set forth above, all - or nearly all - of the funds deposited into Bank Account 1 during the relevant time period were derived, directly or indirectly, from Bank Account 3.  In turn, nearly all – at least 96% - of the approximately $26,193,444.29 deposited into Bank Account 3 was derived from the fraudulent scheme charged in the Superseding Indictment.  This is shown by the financial information, as outlined in FBI FoA Chuna's Affidavit, that Bank Account 3 received at least 96% of its deposits from unregistered brokerage firms ($8,930,408.83), a registered brokerage firm ($16,161,231.99), and a business associated with defendant Vaccaro used to facilitate the fraudulent scheme ($150,000.00).  The circle is closed with defendant Vaccaro's purchase of the (4) subject vehicles using funds from Bank Account 1 and/or Bank Account 3.

In his motion (R. 198), defendant Vaccaro appears to argue that only the proceeds derived from the transactions involving Wilson and Davis - a registered brokerage firm – are tainted.  As stated, Bank Account 3 received tainted deposits from Wilson and Davis, unregistered brokerage firms, and a relatively small amount from an associated business.  Defendant Vaccaro's position appears to be that the funds received from the unregistered brokerage firms are "non-tainted" funds.  This position is unsupported by law or fact.

At footnote 8, PageID 994, of the motion (R. 198), defendant Vaccaro refers to "the sale

25

of 'block trades' to private parties".  In this case, the vast majority of block trades involved

shares of the Manipulated Public Companies sold through individuals or companies acting as

unregistered brokers.  In these instances, defendant Vaccaro forwarded the shares to unregistered

brokers, who then sold the shares and either kicked back a portion of the share sale proceeds to

Vaccaro or had paid Vaccaro up front for the shares.  As set forth, *inter alia*, in the General

Allegations section of the Superseding Indictment (R. 78) and in the Manner and Means

allegations of Count 1, the proceeds of these transactions were part of defendant Vaccaro's

scheme to defraud and, accordingly, were considered by the grand jury as tainted.  Particularly,

paragraph 44 of the General Allegations (PageID 470) alleges:

> VACCARO, SVORAI, RUGGERI, and others acting on their behalf also used
> unregistered brokers to liquidate and sell free trading shares of stock in the Manipulated
> Public Companies after they were unable to continue to clear shares with U.S.-based
> registered brokers.  The Defendants paid the unregistered brokers commissions, in the
> form of kickbacks, for selling the shares of the Manipulated Public Companies into the
> stock market.  …

And, paragraphs 67(j) and 67(k) of the Manner and Means allegations of Count 1 of the

Superseding Indictment (PageID 479) alleged:

> VACCARO, SVORAI, BERLLY, and others, deposited and attempted to deposit
> shares of the Manipulated Public Companies at registered brokers, and if the deposit was
> rejected, Defendants sought out another broker who would accept the deposit.

> VACCARO, SVORAI, HAGEN, and others, paid stock promoters and media
> companies to promote the Manipulated Public Companies at the same time the
> Defendants and others were depositing large blocks of shares with registered and
> unregistered brokers.

To summarize, it is respectfully submitted that defendant Vaccaro has failed to meet the

second prong of the *Jones* test.  Under the second prong, a defendant must show there is a *bona*

*fide* reason to believe that the magistrate judge (in issuing the seizure warrants) and the grand

jury (on the Superseding Indictment) erred in finding probable cause to believe that the

properties would be subject to forfeiture if the defendant is convicted.  Defendant Vaccaro fails the second prong of the *Jones* test because, based upon the financial information set forth in FBI FoA Alex Chuna's Affidavit, it cannot reasonably be disputed that the (4) subject vehicles were purchased with funds traceable to the schemes/acts charged in the Superseding Indictment. Further, defendant Vaccaro's argument that the funds deposited into Bank Account 3 from the unregistered brokerage firms are "non-tainted" is without merit.

## CONCLUSION

The Supreme Court has held that there is no 6th Amendment right to use fraud proceeds to pay for a criminal defense.  *See*, *United States v. Monsanto*, 491 U.S. 600 (1989) and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989).  Accordingly, it follows that a defendant is not entitled to a pretrial, post-seizure hearing on the probable cause basis for a seizure warrant unless he can satisfy the two-prong test established in *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998), and followed by this Court in *United States v. Vaccaro*, No. 1:20-CR-392, 2021 WL 5316391 (N.D. Ohio Nov. 12, 2021).  In the instant case, having failed to satisfy either *Jones* requirement, it is respectfully submitted that Defendant is not entitled to a pre-trial hearing and that his Motion for Release of Assets Pretrial (R. 198) should be denied.

Respectfully submitted,

Michelle M. Baeppler
First Assistant U.S. Attorney, N.D. Ohio

By:  /s/ James L. Morford                              .
James L. Morford (Ohio: 0005657)
Assistant United States Attorney, N.D. Ohio
Carl B. Stokes U.S. Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
216.622.3743 / James.Morford@usdoj.gov